No. 24-5937

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

DO NO HARM, a nonprofit corporation
incorporated in the State of Virginia,

Plaintiff-Appellant,

v.

WILLIAM LEE, in his official capacity
as Governor of the State of Tennessee,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Middle District of Tennessee
Honorable Gregory F. Van Tatenhove, Judge
3:23-cv-01175

---

## APPELLANT'S OPENING BRIEF

---

ANASTASIA P. BODEN
  *Counsel of Record*
JOSHUA P. THOMPSON
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
ABoden@pacificlegal.org
JThompson@pacificlegal.org
*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Appellant certifies that Appellant Do No Harm is a privately owned corporation incorporated in Virginia. No party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES................................................... iii

STATEMENT REGARDING ORAL ARGUMENT.................................1

JURISDICTIONAL STATEMENT ........................................1

STATEMENT OF THE ISSUES.................................................2

INTRODUCTION ....................................................................2

STATEMENT OF THE CASE ..............................................5

SUMMARY OF THE ARGUMENT .........................................8

ARGUMENT ...........................................................................11

    I.    Do No Harm's members are injured regardless of whether the racial quota is met at any given time ....................................11

    II.    The district court's speculation about future appointments does not undermine the injury Do No Harm's members will suffer in 2027................................................................18

    III.    The district court's opinion would insulate the racial quota from judicial scrutiny..................................................22

CONCLUSION ...................................................................23

CERTIFICATE OF COMPLIANCE ........................................24

CERTIFICATE OF SERVICE................................................25

ADDENDUM .........................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bassett v. Snyder*,
951 F. Supp. 2d 939 (E.D. Mich. 2013) ............................................... 18

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ..................................................................... 11–12

*Clements v. Fashing*,
457 U.S. 957 (1982) ........................................................................ 13

*Demis v. Sniezek*,
558 F.3d 508 (6th Cir. 2009) ............................................................. 6

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ........................................................................ 11

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ................................................................... 11, 17

*Hassan v. City of New York*,
804 F.3d 277 (3d Cir. 2015) .............................................................. 16

*Hile v. Michigan*,
86 F.4th 269 (6th Cir. 2023) ............................................................. 12

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ........................................................................ 17

*Mead v. Holder*,
766 F. Supp. 2d 16 (D.D.C. 2011) ...................................................... 19

*Meland v. Weber*,
2 F.4th 838 (9th Cir. 2021) ........................................... 10, 13, 15–16

*Meland v. Weber*,
No. 2:19-CV-02288-JAM-AC, 2021 WL 6118651
(E.D. Cal. Dec. 27, 2021) ................................................................. 16

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ............................................................ 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ........................................................................ 18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v.*
*City of Jacksonville*,
508 U.S. 656 (1993) ............................................................. 9–10, 13–14

*Nuziard v. Minority Bus. Dev. Agency*,
No. 4:23-cv-00278-P, 2024 WL 965299
(N.D. Tex. Mar. 5, 2024) ............................................................. 11, 23

*Oak Ridge Env't Peace All. v. Perry*,
412 F. Supp. 3d 786 (E.D. Tenn. 2019) ................................................. 6

*Ohio National Life Ins. Co. v. United States*,
922 F.2d 320 (6th Cir. 1990) ............................................................. 12

*Osborn v. United States*,
918 F.2d 724 (8th Cir. 1990) ............................................................. 12

*Parents Involved in Community Schools v.*
*Seattle School District*,
551 U.S. 701 (2007) ............................................................. 10, 13–15

*Regents of Univ. of California v. Bakke*,
438 U.S. 265 (1978) ............................................................. 9, 11, 13

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) ............................................................. 20

*RMI Titanium Co. v. Westinghouse Electric Corp.*,
78 F.3d 1125 (6th Cir. 1996) ............................................................. 12

*Saenz v. Roe*,
526 U.S. 489 (1999) ............................................................. 16

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ............................................................. 23

*Thomas More Law Ctr. v. Obama*,
651 F.3d 529 (6th Cir. 2011) ............................................................. 18–20

*Turner v. Fouche*,
396 U.S. 346 (1970) ............................................................. 9–10, 13

*Village of Bensenville v. FAA*,
376 F.3d 1114 (D.C. Cir. 2004) ............................................................. 19

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) ............................................................. 14

iv

## Statutes

28 U.S.C. § 1291...................................................................................1

28 U.S.C. § 1331...................................................................................1

28 U.S.C. § 1343(a)(3)..........................................................................1

28 U.S.C. § 2201...................................................................................1

28 U.S.C. § 2202...................................................................................1

42 U.S.C. § 1983...................................................................................1

Tenn. Code § 8-1-111........................................................................2, 7

Tenn. Code § 63-1-124...........................................................................7

Tenn. Code § 63-3-103...........................................................................7

Tenn. Code § 63-3-103(b)...................................................................2, 7

Tenn. Code § 63-3-103(d).....................................................................20

Tenn. Code § 63-3-213...........................................................................7

## Other Authorities

Fed. R. Evid. 902...................................................................................6

Tennesee Department of Health, Board of Pediatric
    Examiners, https://www.tn.gov/health/health-program-
    areas/health-professional-boards/podiatric-
    board/podiatric-board/members.html ...................................................6

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Do No Harm requests oral argument because this case involves Article III standing and the ability of civil rights plaintiffs to bring a constitutional challenge in federal court. This case concerns an especially important civil rights violation—deprivation of equal treatment on the basis of race—that merits full and vigorous argument by the parties and the opportunity to answer any questions that the judges may have.

## JURISDICTIONAL STATEMENT

This lawsuit, filed in the United States District Court for the Middle District of Tennessee, arises under 42 U.S.C. § 1983. First Am. Compl., Doc. 23, PageID # 82. The district court had federal-question jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 2201–02. *Id.* The district court granted dismissal to Defendant, Opinion on MTD, Doc. 37, PageID # 206, and that court's final, appealable order gave this Court jurisdiction under 28 U.S.C. § 1291.

This appeal is timely because final judgment was entered on August 8, 2024, Judgment, Doc. 38, PageID # 217, and Appellant appealed on August 30, 2024, within the 30 days allowed by Fed. R. App. P. 4(a)(1)(A). Notice of Appeal, Doc. 40, PageID # 219.

## STATEMENT OF THE ISSUES

Whether Appellant, a nationwide membership organization with two members who are qualified, willing, ready, and able to serve on the Tennessee Board of Podiatric Medical Examiners, is injured by two Tennessee laws requiring the Governor to maintain a racial quota when appointing individuals to serve on the Board.

## INTRODUCTION

Two Tennessee laws require the Governor to discriminate based on race when appointing individuals to the Board of Podiatric Medical Examiners (Board). *See* Tenn. Code §§ 8-1-111 & 63-3-103(b). And yet under the district court's opinion, no one has standing to challenge them. That decision is wrong and should be overturned.

Appellant Do No Harm is a nationwide membership organization of over 6,000 medical professionals, students, and policymakers dedicated to eliminating racial discrimination in healthcare. First Am. Compl., Doc. 23, PageID # 83. Two of its members, Member A and Member B, are qualified, ready, willing, and able to serve on the Board. *Id.* Member A is a licensed podiatrist who is eligible for the (at minimum) three podiatrist seats that will open before 2027, the podiatrist seat that will open in

2027, as well as any other podiatrist openings that may arise. *Id.* Member B is a Tennessee resident eligible for the open citizen member seat. *Id.*

On their face, the challenged laws establish a racial quota and require the Governor to maintain at least one racial minority on the Board. This puts non-minority Tennesseeans on an unequal playing field: minorities are eligible for all six seats while non-minorities are eligible for just five. However, the district court ruled that because the Board currently meets the quota, the Governor is under no legal obligation to racially discriminate again until the sole minority board member's seat opens in 2027. Opinion on MTD, Doc. 37, PageID # 214. Accordingly, it concluded that Do No Harm's qualified members will suffer no injury when the Governor makes appointments in 2025 and 2026, since the quota is likely to be satisfied during those years. *Id.* The lower court went further and held that because it is theoretically possible the Governor will appoint a second minority board member before 2027, Do No Harm could not show that its members were likely to suffer an injury in 2027, either. *Id.* at PageID # 216.

That decision is wrong for at least three reasons. First, it misunderstands Member A's and Member B's injuries. In a prospective

equal protection lawsuit like this one, the injury is being subject to a law that places the plaintiffs on an unequal playing field. And here, minorities may compete for all six seats while non-minorities may only compete for five. It's irrelevant whether the Governor is forced to make a discriminatory appointment in any one year; it's relevant only that the law takes one seat off the table for Do No Harm's members and forces them to compete in a system that prioritizes race.

Second, even under the district court's own reasoning, Member A and Member B will be injured in 2027 when the minority-reserved seat opens and the Governor is once again forced to appoint someone based on race. Under clear precedent from this Court, speculation about what may happen before that time does not render an injury uncertain or unripe.

Last, the district court's opinion effectively insulates a state-sponsored racial quota from judicial scrutiny. It holds that because the Governor has already racially discriminated in his appointments to the Board, no plaintiff will be injured until the quota-satisfying board member's seat opens. At the same time, the lower court held that no one can sue based on that impending injury until it's metaphysically certain there won't be another sitting minority board member. Together, this

makes it next to impossible for plaintiffs to thread the needle and bring a lawsuit when the case is ripe but not moot.

Perhaps worst of all, the decision below encourages the Governor to engage in racial discrimination. The district court has given the Governor a blueprint for evading judicial scrutiny: so long as he ensures that at least one minority board member is sitting when it's time to fill the open seat in 2027, no one will have standing to sue. This Court should not interpret Article III in a way that would insulate a racial quota from equal protection scrutiny in perpetuity. Neither should the Court endorse an opinion that outright encourages the Governor to engage in racial discrimination to avoid judicial review of a race-based law.

## STATEMENT OF THE CASE

Do No Harm is a nationwide membership organization of over 6,000 medical professionals, students, and policymakers dedicated to eliminating racial discrimination in healthcare. FAC, Doc. 23, PageID # 83. Do No Harm has members that are qualified, ready, willing, and able to be appointed to the Tennessee Board of Podiatric Medical Examiners. *Id.* In particular, Member A is a licensed podiatrist who has been practicing in Tennessee for over 30 years. *Id.* He resides and

practices podiatry in Tennessee and is ready, willing, and able to be appointed to the Board when podiatrist seats are scheduled to open in 2025, 2026, 2027, and beyond,[1] or any other time that they might open due to removal, retirement, or incapacity. *Id.*

Member B is a Tennessee citizen and has resided in Tennessee for over 27 years. *Id.* He does not engage in any profession that is subject to regulation by the Board. *Id.* He is ready, willing, and able to be appointed as a citizen member to the Board. *Id.*

The Board of Podiatric Medical Examiners was created in 1931 to regulate the practice of podiatry in Tennessee. *Id.* at PageID # 85. It interprets the laws, rules, and regulations governing podiatry in Tennessee, licenses qualified podiatrists, investigates allegations of misconduct, and disciplines podiatrists that violate its rules or regulations. *Id.* The Board is comprised of six members appointed by the

---

[1] The terms for sitting board members can be found at https://www.tn.gov/health/health-program-areas/health-professional-boards/podiatric-board/podiatric-board/members.html. Information that is available on government websites is self-authenticating pursuant to Rule 902 of the Federal Rules of Evidence, and "courts may accordingly take judicial notice of the information found on these websites." *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 810 n.6 (E.D. Tenn. 2019) (citing *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009) (taking notice of government website).

Governor. *Id.* Four of those members must be licensed Tennessee podiatrists who have been regulated by the Board for at least two years. Tenn. Code § 63-3-103. A fifth member must be a licensed orthotist, prosthetist, or pedorthist. Tenn. Code § 63-3-213. A sixth member must be a citizen member who does not engage in any conduct that is regulated by the Board. Tenn. Code § 63-1-124.

Members of the Board are appointed by the Governor to four-year terms. Tenn. Code Ann. § 63-3-103(b). However, not everyone is on an even playing field when it comes to getting appointed. Tennessee law requires the Governor to consider race for all appointments, because the Governor must "strive to ensure that at least one (1) such citizen … is a member of a racial minority." Tenn. Code § 8-1-111; *see also id.* § 63-3-103(b) (same).

At the end of June 2023, the seat held by Dr. Bhekumuzi Khumalo, the Board's only minority member, opened due to the natural expiration of his term. FAC, Doc. 23, PageID # 85. He was not reappointed in the months that followed. On November 8, 2023, Do No Harm challenged the board quota under the Equal Protection Clause of the Fourteenth Amendment seeking declaratory and injunctive relief so that its

members would be placed on an even field during the next appointment process. Complaint, Doc. 1, PageID # 1. At the time, the Board's website and all other publicly available information suggested that there were at least two open seats on the Board. FAC, Doc. 23, PageID # 86. However, the Governor has since indicated that it reappointed Dr. Khumalo on November 1, seven days before Do No Harm sued. *Id.* His term is set to expire in 2027, and at least three other podiatrist seats will open before then—two in June of 2025 and one in June of 2026. The citizen member position is currently open. Member A and Member B are qualified, ready, willing, and able to be appointed to these seats.

The Board filed a motion to dismiss Do No Harm's first amended complaint for lack of standing on February 2, 2024. MTD, Doc. 25, PageID # 92. The district court granted that motion on August 8, 2024. Opinion on MTD, Doc. 37, PageID # 206. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

Tennessee's racial board quota limits the number of seats that Do No Harm's members can compete for solely due to their race. That is an ongoing and quintessential equal protection injury and Do No Harm therefore has standing to sue based on the harm to its members. *See, e.g.*,

*Regents of Univ. of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978);
*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

The district court ruled that in the years where the racial quota is met, Do No Harm's members will not suffer any injury because the Governor is under no legal obligation to discriminate for that specific appointment. Opinion on MTD, Doc. 37, PageID # 214. That misunderstands the members' injury, is contradicted by Supreme Court precedent, and would lead to untenable consequences.

First, the racial quota injures Do No Harm's members because it automatically takes one seat off the table due solely to those members' race. *Bakke*, 438 U.S. at 280 n.14. That is an ongoing injury, since they are eligible for fewer seats than potential minority appointees every day that the quota remains in effect. As the Supreme Court has explained, individuals "have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970). Much like the plaintiffs in *Turner*, Member A and Member B cannot be subjected to

"the privilege of holding public office … on the basis of distinctions that violate federal constitutional guarantees." *Id.* at 362–63.

The members suffer that injury regardless of whether the Governor discriminates in any one year and regardless of whether they are excluded for race-neutral reasons. The injury in an equal protection lawsuit is not the denial of a benefit, but rather being subject to an unequal law. *Northeastern Contractors*, 508 U.S. at 666. The Supreme Court has repeatedly allowed plaintiffs to challenge racial preferences when they cannot prove they would have secured a spot absent the racially discriminatory criteria, *id.*, when they may eventually be denied for race-neutral reasons, *id.*, and when the challenged law encourages discrimination but may have no eventual effect at all. *See, e.g., Parents Involved in Community Schools v. Seattle School District*, 551 U.S. 701, 719 (2007); *see also Meland v. Weber*, 2 F.4th 838, 845 (9th Cir. 2021).

Second, even under the district court's reasoning, Do No Harm's members will be injured by the race-conscious appointments that will inevitably happen when Dr. Khumalo's seat opens in 2027. The type of speculation the district court engaged in about what may happen in the intervening two and a half years has been rightly rejected by this Court.

Last, the district court's decision effectively insulates a patently unconstitutional racial quota from ever being stricken from Tennessee law. And it incentivizes the Governor to engage in racial discrimination, since so long as there is at least one minority member when another seat opens, no plaintiff has standing to sue. Standing is merely a requirement that "plaintiffs have skin in the game." *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-cv-00278-P, 2024 WL 965299, at *6 (N.D. Tex. Mar. 5, 2024). This Court should not apply it in a way that ensures no one ever does.

The decision below should be reversed.

## ARGUMENT

### I.  Do No Harm's members are injured regardless of whether the racial quota is met at any given time

Do No Harm has standing because its members are unable to compete for all of the seats on the Board due to their race. *See, e.g.*, *Bakke*, 438 U.S. at 280 n.14 (Article III was met by "the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race."); *Gratz v. Bollinger*, 539 U.S. 244, 293 (2003) (Souter, J., dissenting) (affirming quotas are unconstitutional)*; Grutter v. Bollinger*, 539 U.S. 306, 309 (2003) (same)*; City of Richmond v. J.A. Croson Co.*, 488

11

U.S. 469, 499 (1989) (same). Its members are qualified, willing, ready, and able to be considered for the podiatrist seats that will open beginning in 2025, as well as the consumer member seat that remains open.[2] But Tennessee law establishes a racial quota that takes one seat off the table based on race alone. Because the quota places Do No Harm's members on an unequal playing field, they suffer a quintessential Article III injury every time the Governor considers and ultimately appoints an individual to the Board. Do No Harm has standing to sue on those injured members' behalf.

The district court ruled that because the quota is currently filled by Dr. Khumalo, who is a racial minority, the Governor will lack any legal

---

[2] When reviewing a facial attack to a complaint under Rule 12(b)(1) for lack of standing, a court "must accept the allegations set forth in the complaint as true" while "drawing all inferences in favor of the plaintiff." *Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023). At the pleading stage, "a plaintiff need only demonstrate a plausible entitlement to standing." *Id.* at 274 (citation omitted). Where a trial court's ruling on jurisdiction is based in part on the resolution of factual disputes, a reviewing court must accept the district court's factual findings unless they are clearly erroneous. *Ohio National Life Ins. Co. v. United States*, 922 F.2d 320, 326 (6th Cir. 1990); *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (if the trial court relied upon its own determination of disputed factual issues, the appellate court must then review those findings under the "clearly erroneous" standard). "[R]eview of the district court's *application of the law* to the facts is *de novo*." *RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996).

obligation to make appointments based on race until Dr. Khumalo's term expires in 2027. Opinion on MTD, Doc. 37, PageID # 214. According to the court, this means that Do No Harm's members will suffer no injury until Dr. Khumalo's seat is vacated. But the inability to compete for all of the slots because of a racial quota has repeatedly been held to constitute an Article III injury, regardless of the quota's ultimate effect on the applicant. *See, e.g., Bakke*, 438 U.S. at 280 n.14 ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing."); *see also Turner*, 396 U.S. at 362 (individuals have a constitutional right to be considered for public office without discriminatory qualifications); *Clements v. Fashing*, 457 U.S. 957, 962 (1982) (plaintiffs suffer an Article III injury when government imposes an obstacle to their candidacy for public office). And the Supreme Court has repeatedly ruled that plaintiffs in an equal protection lawsuit need not show that the law is keeping them from a certain benefit; rather, it's sufficient that they demonstrate that they are subject to a racially discriminatory law. *See, e.g., Northeastern Contractors*, 508 U.S. at 666; *Parents Involved*, 551 U.S. 701; *see also Meland*, 2 F.4th at 844.

13

For example, in *Northeastern Contractors*, 508 U.S. at 666, the government argued that the plaintiffs lacked standing to challenge a race-conscious public contracting scheme because the plaintiffs failed to allege that they would have actually secured the contract absent the racial preferences. According to the government, if the plaintiffs could not show that the racial preferences were having a discriminatory effect on their ability to secure the contract, then they could not demonstrate an Article III injury. The Supreme Court rejected this argument, recognizing that plaintiffs are injured "from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (same). In other words, the injury is not a law's discriminatory outcome, but rather the discriminatory barrier created by the law itself.

Similarly, in *Parents Involved*, 551 U.S. 701, a group of parents challenged a school assignment plan that used racial criteria when allocating spots at oversubscribed schools. The government argued that the parents' injury was speculative because it was possible that the families would not be denied admission based on their race. The Supreme Court rejected this argument, ruling that "[t]he fact that it is possible

that children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage—does not eliminate the injury claimed." *Id.* at 718–19. Regardless of whether race kept them out of their desired school, the parents suffered at least two injuries: (1) they were subject to a system in which they "may be" denied admission based on race, *id.* at 718; and (2) they were "forced to compete for seats … in a system that uses race as a deciding factor in many of its admissions decisions." *Id.* at 719. In other words, they were injured by virtue of being subject to a race-conscious process even if they ultimately were not subject to racial discrimination themselves.

In fact, courts have found that the plaintiffs have standing even when a discriminatory law merely "encourages" unconstitutional discrimination but does not require it. In *Meland*, 2 F.4th at 844, the government argued that a shareholder lacked standing to challenge a Woman Quota for corporate boards because the law did not actually require shareholders to vote for women. Instead, it merely "encourage[d]" them to do so by imposing a penalty on noncompliant corporations. *Id.* And in fact, discovery later revealed that the plaintiff flouted the quota

and chose not to vote based on sex. *Meland v. Weber*, No. 2:19-CV-02288-JAM-AC, 2021 WL 6118651, at *3 (E.D. Cal. Dec. 27, 2021).

The Ninth Circuit held that plaintiffs have standing to challenge laws that "require or encourage" them to discriminate. *Meland*, 2 F.4th at 844. Because "ethnic or sex discrimination [is] odious," a plaintiff "is hurt by a law requiring it to discriminate, *or try to* discriminate," regardless of the law's ultimate effect. *Id.* (quoting *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 707–08 (9th Cir. 1997)); *cf. Hassan v. City of New York*, 804 F.3d 277, 289–90 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("A 'discriminatory classification is itself a penalty,' *Saenz v. Roe,* 526 U.S. 489, 505 (1999), and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." (parallel citations omitted)).

It's easy to understand why. Even race-conscious laws that don't cause an explicitly discriminatory outcome still affect the process and are inherently pernicious. Tennessee's podiatry board quota, for instance, makes race relevant to each and every nomination by requiring the Governor to discern the Board's racial composition prior to filling any open seat, to analyze whether the board meets the quota, and to evaluate

potential appointees based on their race. The behavior mandated by this quota is odious to a free and equal people. The Governor must either adjudge the board members' and applicants' race based on their photos, an inherently imprecise and stereotypical process, or require some sort of proof of their racial identity. "It is a sordid business, this divvying us up by race," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring), and federal courts have little tolerance for it.

In sum, it's irrelevant whether Tennessee's quota actually operates to exclude Do No Harm's members based on race for any one seat; it's relevant only that the inescapably race-conscious process treats them unequally, because "every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, 539 U.S. at 353 (Thomas, J., concurring). The district court was therefore wrong to conclude that so long as the quota is filled, Do No Harm's members suffer no injury.

17

## II.    The district court's speculation about future appointments does not undermine the injury Do No Harm's members will suffer in 2027

Even if it were true that Do No Harm's members suffer no injury while the quota is filled, Do No Harm has standing based on the members' desire to be considered for seats that will open after the only minority board member's term expires in 2027. At that time, the quota will no longer be filled and Do No Harm's members wish to be considered on an equal playing field with everyone else.

That injury is sufficiently imminent because a term lasts four years and Dr. Khumalo only has three years remaining. The Governor must, in fact, consider another appointment in 2027. "Imminence is a function of probability," not temporal proximity. *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 536 (6th Cir. 2011), *abrogated as to other issues by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *see also Bassett v. Snyder*, 951 F. Supp. 2d 939, 951 (E.D. Mich. 2013) ("[T]he relevant inquiry is whether a future injury is likely to occur, not when it will occur."). This Court has held that a harm that is years in the future will support standing if that harm is sufficiently certain. *Thomas More Law Ctr.*, 651 F.3d 529. And the Supreme Court "has allowed challenges to go

18

forward even though the complaints were filed almost six years and roughly three years before the laws went into effect." *Id.* at 537 (citing cases); *see also Mead v. Holder*, 766 F. Supp. 2d 16, 26 (D.D.C. 2011) (about three years); *Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (over thirteen years).

The district court ruled that Do No Harm's members will not suffer any injury before 2027, since the quota will remain satisfied until that time. On its face, this would at least mean that Members A and B will indisputably suffer an injury in 2027. But by speculating that the Governor *might* appoint another minority member prior to Dr. Khumalo's departure—meaning the Governor *might* not have a legal obligation to discriminate when filling Dr. Khumalo's seat, either—the district court avoided the logical result and ruled that Member A and Member B also failed to show they would suffer an injury even in 2027.

First, as explained above, Do No Harm's members are injured because they cannot compete for all of the seats on the Board solely because of their race. They also suffer an injury based on each and every appointment under the quota because they are forced to compete in a race-conscious system. But second, in *Thomas More Law Center*, 651 F.3d

at 537, this Court rejected these hypothetical arguments as insufficient to undermine standing or create a ripeness issue. The Court rejected the argument that harm was not imminent because the plaintiffs could "leave the country or die" or "Congress could repeal the law." *Id.* "[T]hese events," the court held, "are hardly probable and not the kinds of future developments that enter into the imminence inquiry." *Id.* (citing *Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir. 1995) ("[I]t is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable.")). Likewise, the district court's speculation about the composition of the Board in 2027 does not "enter into the imminence inquiry." As in *Thomas More Law Center*, "[t]here is no reason to think that [Do No Harm's members'] situation will change," and "there is no reason to think the law will change." 651 F.3d at 538.

Here, Do No Harm's members will suffer an injury in 2027 (if not earlier),[3] since the only minority board member's term will expire at that

---

[3] It is equally plausible that Dr. Khumalo will leave his seat before the Governor can appoint another minority member. Unanticipated vacancies can and do arise prior to the expiration of a member's term, such as when a member resigns, passes away, or is removed. *See* Tenn. Code § 63-3-103(d) (discussing how the Governor is to fill vacancies).

time and the Governor will therefore have a legal obligation to make an appointment based on race. Do No Harm should be able to challenge that unconstitutional action now. In fact, it will be very difficult for Do No Harm to divine the sweet spot for filing such that its case would be both ripe and not moot. If it doesn't wait long enough, the district court's decision renders it unripe. But civil rights lawsuits often take years to finish; forcing Appellant to wait to file until 2027 would allow the Governor to fill the quota before it could secure a final judgment, and under the district court's opinion, once the quota is filled, there is no constitutional injury.

What's more, the opaque nomination process offers potential nominees no clue as to when the Governor begins considering candidates. Indeed, while all publicly available information suggested there was an open seat when Do No Harm brought this lawsuit, Defendant informed the parties after the lawsuit was filed that the spot had apparently been filled. In short, Do No Harm should not be forced to try to thread the needle between ripeness and mootness and instead should be able to bring this constitutional challenge based on its impending injury now.

21

## III.  The district court's opinion would insulate the racial quota from judicial scrutiny

Under the district court's theory, the Governor could deliberately choose the next nominee based on race, and yet no individual would ever suffer an Article III injury (because the Governor is supposedly free from the quota's legal effect until 2027), nor would any plaintiff have standing to challenge any subsequent race-based appointment (because the quota would then be filled by two minority members—meaning that even when Dr. Khumalo vacates his seat, the quota will remain filled, which the district court ruled means that no plaintiff has standing). At that point, the Governor could continuously engage in racial discrimination free of judicial scrutiny. In other words, the district court's theory of standing not only tolerates racial discrimination, but—for governors who want to avoid high-profile discrimination lawsuits—it affirmatively encourages discrimination.

This Court should not accept a theory of standing that allows the Governor to discriminate based on race in perpetuity and with impunity. The district court's opinion all but shields the quota from judicial review, or at the very least, provides the Governor with a roadmap to avoid a constitutional challenge through continuous discrimination. The Court

need not accept those drastic consequences. Instead, it should conclude that Do No Harm and its members, who include a qualified Tennessee podiatrist and a qualified citizen, "have skin in the game." *Nuziard*, 2024 WL 965299, at \*6; *see also Sierra Club v. Morton*, 405 U.S. 727, 731 (1972) (defining standing as merely "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy").

## CONCLUSION

For the foregoing reasons, the district court's opinion dismissing the complaint for lack of standing should be reversed.

DATED: October 28, 2024.

Respectfully submitted,

/s/ *Anastasia P. Boden*
ANASTASIA P. BODEN
  *Counsel of Record*
JOSHUA P. THOMPSON
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
ABoden@pacificlegal.org
JThompson@pacificlegal.org
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(b)(i) and 6th Cir. R. 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   [X] this document contains 4,828 words

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [X] this document has been prepared in proportionally spaced typeface using Century Schoolbook 14 point font.

DATED: October 28, 2024.

/s/ *Anastasia P. Boden*
ANASTASIA P. BODEN

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Anastasia P. Boden*
ANASTASIA P. BODEN

**ADDENDUM**

## <u>DESIGNATION OF RELEVANT DOCUMENTS</u>

| Docket Entry | Document Name | PageID# |
|:---:|:---:|:---:|
| 1 | Complaint | 1–10 |
| 23 | First Amended Complaint | 81–90 |
| 25 | Motion to Dismiss | 92–116 |
| 37 | Memorandum Opinion and Order Granting Defendant's Motion to Dismiss | 206–216 |
| 38 | Order | 217 |